78 P.3d 341

**In the Matter of Jane DOE, Respondent/Subject–Appellant.**

Nos. 23534, 23806.

Intermediate Court of Appeals of Hawai'i.

Sept. 30, 2003.

Cindy A.L. Goodness, Deputy Public Defender, State of Hawai'i for respondent/subject-appellant.

Julio C. Herrera, Deputy Attorney General, State of Hawai'i for petitioner-appellee Department of Health (Andrea J. Armitage, Jay K. Goss, and Mary Anne Magnier, Deputy Attorneys General, State of Hawai'i on the briefs).

BURNS, C.J., and WATANABE, J.; and FOLEY, J., concurring separately.

Opinion of the Court by WATANABE, J.

In these consolidated appeals [1] Respondent/Subject Appellant Jane Doe (Doe) challenges two orders entered by the Family

---

1. On June 6, 2002, the two appeals (No. 23534 and No. 23806) filed by Respondent/Subject Appellant Jane Doe (Doe) were consolidated because they involved the same parties and similar issues.

Court of the First Circuit (the family court), involuntarily committing her to the Hawai'i State Hospital (HSH) for successive ninety-day periods, upon petitions filed by Petitioner Appellee Department of Health, State of Hawai'i (the State) pursuant to Hawaii Revised Statutes (HRS) chapter 334 (1993).[2] Specifically, Doe appeals from the: (1) Findings and Order of Involuntary Hospitalization entered by Judge Marilyn Carlsmith (Judge Carlsmith) on June 19, 2000(Order 1); and (2) Findings and Order of Involuntary Hospitalization entered by Judge James R. Aiona, Jr. (Judge Aiona) on October 3, 2000 (Order 2).

There is no question that Doe suffers from a chronic and serious mental illness. She has been diagnosed as suffering from schizophrenia, paranoid type, as well as schizoaffective disorder, bipolar type, and has a history of: paranoid, persecutory delusions; responding to internal stimuli, as manifested by her talking to herself, gesturing, and engaging in purposeless behaviors; disturbed sleep; psychomotor agitation; disorganized thinking; rambling speech; lack of insight; and poor judgment. While she apparently has not been physically violent in the past, she often directs loud racist, inflammatory remarks at others, often in their faces, prompting concerns that she will provoke physical retaliation against her. During previous stays in mental institutions and halfway houses, Doe's words have led to angry confrontations with other patients and staff.

Although medication has been shown to help Doe, she refuses to take any voluntarily, partly due to her paranoia and mistrust of

others. Doe's paranoia has also led to a history of poor self-care and neglect, with Doe often not eating out of fear that she would be "poisoned." Due to Doe's increasingly paranoid behavior, Doe's parents and brother, who have been appointed as the co-guardians of Doe's person (Co-guardians), are no longer able to care for Doe in their home. They have therefore supported the State's successive petitions to hospitalize Doe and involuntarily administer to her the medications they believe she needs to get better.

Pursuant to HRS chapter 334, the statutory criteria for involuntary hospitalization are as follows:

**Involuntary hospitalization criteria.** A person may be committed to a psychiatric facility for involuntary hospitalization, if the court finds:

(1) That the person is mentally ill or suffering from substance abuse;

(2) *That the person is imminently dangerous to self or others,* is gravely disabled or is obviously ill; and

(3) That the person is in need of care or treatment, or both, and there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization.

HRS § 334–60.2 (1993) (emphasis added). The first criterion must be established by the "beyond a reasonable doubt" standard, and the second and third criteria must be established by the "clear and convincing evidence" standard. HRS § 334–60.5(i) (Supp.2002).[3]

2. On February 6, 2001, Petitioner Appellee Department of Health, State of Hawai'i (the State) filed a motion to dismiss appeal No. 23534 as moot, on grounds that Doe had been discharged from the Hawai'i State Hospital. By an order dated February 28, 2001, the Hawai'i Supreme Court denied the State's motion, presumably because the appeal presented questions affecting the public interest that are capable of repetition, yet evading full review. *See Okada Trucking Co. v. Board of Water Supply,* 99 Hawai'i 191, 197, 53 P.3d 799, 805 (2002).

The parties also raised a mootness argument in the briefs for appeal No. 23806. As noted above, this argument has already been dismissed by the Hawai'i Supreme Court in appeal No. 23534. Because the issues presented in the two consolidated appeals are similar, the same result should

be applied to appeal No. 23806. Accordingly, we conclude that appeal No. 23806 is not moot. Other courts have reached the same conclusion in similar situations. *See, e.g., In re Stephanie B.,* 826 A.2d 985 (R.I.2003); *State v. Walker,* 93 Wash.App. 382, 967 P.2d 1289 (1998); *State ex. rel. Shifflet v. Rudloff,* 213 W.Va. 404, 582 S.E.2d 851 (2003).

3. Hawaii Revised Statutes (HRS) § 334–60.5(i) (Supp.2002) provides, in relevant part:

If the court finds that the criteria for involuntary hospitalization under section 334–60–2.2(1) has been met beyond a reasonable doubt and that the criteria under sections 334–60.2(2) and 334–60.2(3) have been met by clear and convincing evidence, the court may issue an order to any police officer to deliver

In its petitions for Doe's involuntary hospitalization that underlie these appeals, the State claimed that Doe:

> is a person who is mentally ill or suffering from substance abuse, and is *imminently and substantially dangerous to self or others* and is in need of care or treatment, or both, and that there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization, thereby being within the purview of chapter 334, Hawaii Revised Statutes, as amended, and as defined by law.

(Emphasis added.) In other words, as to the second statutory criterion, the State focused on Doe's "imminent dangerousness to self or others" and not on whether Doe was "gravely disabled or . . . obviously ill[.]"[4]

On appeal, Doe does not challenge the family court's findings that she met the first and third criteria for involuntary hospitalization. Doe argues that she was unconstitutionally hospitalized because there was insufficient evidence that she was imminently dangerous to herself or others. Doe asserts that the family court's orders were based on mere "antisocial behavior," i.e., her aggressive racist remarks, and such remarks constituted protected free speech for which she could not be involuntarily hospitalized.

We reverse Orders 1 and 2.

## BACKGROUND

Doe is a *magna cum laude* graduate from Chaminade University who has grappled with mental illness since her teen years. When she was thirteen years old, she was treated for depression. In December 1994, Doe was admitted to Queen's Medical Center (Queen's) after exhibiting bizarre behavior, including placing fish from the refrigerator into a mailbox. In August 1996, Doe was again hospitalized at Queen's for psychiatric

---

treatment. In 1996 and 1997, Doe received follow-up outpatient treatment at the Kalihi–Palama Community Mental Health Center; however, she refused to take any medication and her paranoid behavior became progressively worse. She refused, for example, to eat food prepared at home because she thought the food was being poisoned.

On November 14, 1998, Doe was arrested and charged with Criminal Trespass in the First Degree after she loudly and abusively antagonized her parents and refused to leave their home when requested to do so. Because she bit the arresting police officer and resisted arrest, Doe was also charged with assault of a police officer and resisting arrest. Two days later, Doe was sent to the Women's Correctional Facility, where, upon psychiatric evaluation, she was determined to be unfit to proceed to trial.

On January 6, 1999, Doe was admitted to HSH for treatment and care. However, she refused treatment and never gained fitness. Consequently, the criminal charges against her were dropped on April 29, 1999.

## PROCEDURAL HISTORY

A. *Family Court Proceeding FC–M No. 99–0434*

On July 16, 1999 in FC–M No. 99–0434, the State filed a Petition for Involuntary Hospitalization of Doe in the family court (Petition 1). Attached to Petition 1 was a Certificate of Physician signed by HSH staff psychiatrist Dr. Thomas E. Henry (Dr. Henry), who certified that he had examined Doe on July 15, 1999, at 9:00 a.m. and had reason to believe that she was:

> mentally ill . . . [a]s manifested by . . . paranoid, persecutory delusions. Appears to be responding to internal stimuli. Sleep disturbance. Psychomotor agitation. Dis-

---

the subject to a facility that has agreed to admit the subject as an involuntary patient, or if the subject is already a patient in a psychiatric facility, authorize the facility to retain the patient for treatment for a period of ninety days unless sooner discharged.

4. During oral arguments before this court, the deputy attorney general representing the State

admitted that in seeking to involuntarily hospitalize Doe, the State focused on Doe's imminent and substantial dangerousness to self or others. The State did not seek to establish that Doe was "gravely disabled" or "obviously ill" because of concerns that involuntary hospitalization on such grounds would not pass constitutional muster.

organized thinking. Rambling speech. No insight. Poor judgement [sic][;]

. . . .

imminently and substantially dangerous to . . . self . . . [and] . . . other persons . . . [a]s manifested by such acts, attempts or threats as the following: incites anger, assaultive behaviors in peers, pushed peer, makes racial slurs, intrusive, does not respect boundaries[;]

. . . .

. . . in need of care and/or treatment, and there is no alternative available through existing facilities and programs which would be less restrictive than hospitalization;

. . . not capable of realizing and making a rational decision with respect to his/her need for treatment.

On July 22, 1999, the family court, Judge Lillian Ramirez–Uy presiding, appointed Jerry I. Wilson, Esquire as the guardian ad litem (the GAL) for Doe.[5]

On July 29, 1999, the family court, Judge Peter Fong (Judge Fong) presiding, entered Findings and Order of Involuntary Hospitalization that granted Petition 1 and ordered Doe to be retained at HSH for "care and/or treatment until placement in an alternative facility for a period not to exceed 90 days, unless sooner discharged, from . . . the termination date of the current commitment on July 27, 1999."

On October 15, 1999, the State filed a Repetition for Involuntary Hospitalization "to continue [Doe's] hospitalization" (Petition 2). In a Certificate of Physician filed in support of the repetition on October 19, 1999, Dr. Henry certified that he had examined Doe on October 14, 1999, and had reason to believe that Doe was

mentally ill[,] . . . [a]s manifested by . . . paranoid, persecutory delusions. Responding to internal stimuli as manifested by talking to self, gesturing, purposeless behaviors. Psychomotor agitation. Disturbed sleep. Disorganized, tangential thought process. Rambling speech. No insight. Poor judgement [sic].

Dr. Henry also stated that Doe was "imminently and substantially dangerous" to herself,

[a]s manifested by such acts, attempts or threats as the following: Incites others to anger & assaultive behaviors towards self. Pushed peer. Racial slurs. Intrusive, does not respect boundaries.

Finally, Dr. Henry certified that Doe was "in need of care and/or treatment, and there [was] no alternative available through existing facilities and programs which would be less restrictive than hospitalization" and that Doe was "not capable of realizing and making a rational decision with respect to . . . her need for treatment."

On October 15, 1999, the State also filed a Motion for Order Authorizing the Involuntary Administration of Medication, seeking authority to involuntarily administer medications, including psychiatric medications, and involuntarily administer laboratory studies, as clinically necessary, to Doe. A proposed treatment plan for Doe prepared by Dr. Henry was attached to the motion.

In describing Doe's clinical status that prompted the proposed treatment plan for Doe, Dr. Henry stated, in part:

During this current hospitalization she has been under constant observation, and has been placed on, fifteen minute checks around the clock for protection of self and other [sic]. She has been loud, disruptive, and confrontational. She provokes and angers peers daily, using racial slurs. She displays paranoid behaviors. She expresses concerns about being monitored by video devices in the building that is being transmitted to computers at the nurse's station. She has attempted to cover objects she feels are monitoring her. To protect herself from being monitored she has covered windows, mirrors, and has attempted to bathe in the dark. She has refused food that she perceived to be prepared by an ethnic group she does not approve of, i.e. Japanese, Filipino, Portuguese, and Samoan. She has described her hospitalization as an experiment on her by the "Chings" who are controlled by the

5. In all subsequent proceedings, Jerry I. Wilson, Esquire was appointed the guardian ad litem.

Japanese because they married a Filipino. She feels that medications are poisons and tries to influence her peers not to take medications by telling them that prescription medication [sic] are poisonous. On 5/7/99, she knocked a chair over causing a peer to fall, stating that she did not want a Japanese sitting in the chair, threatening to throw or may have thrown books at that person, and persisted with loud, threatening remarks towards that person. The peer reportedly retaliated by hitting [Doe] with a small radio. [Doe] will taunt peers with various racial or derogatory remarks. On 9/8/99, she told a female peer of Polynesian ancestry, who is much larger than her, "... you make KPT look bad, you must not have graduated from Kamehameha", and again referring to the peer, "... she must be faking her symptoms. I don't want psychiatry or psychology putting me in an experimental group with her. She just wants to be paid to be in here." This peer was angered by [Doe's] remarks threatening bodily harm. [Doe] will frequently make statements that are sexual in nature. She has complained of being sexually molested while at HSH. These complaints have no basis of truth with [Doe] being under constant observation for safety concerns. Staff has voiced concerns about a possible history of sexual abuse because of her comments and behaviors (e.g. wearing several layers of clothing and using several sanitary napkins at once even when not on her menses). She made comments to a female staff during a group activity, "oh I let you get off on that ... you get your orgasms from giving classes ... are your nipples hard when you talk to me? Are you having an orgasm now?" Her thought process has been described as loose, tangential, rambling, flighty, and word salad. At times she appears to be responding to internal stimuli, talking to herself, appearing hypervigilant, and anxious. Because of agitated, provocative, non-redirectable behaviors she has required emergency medications for behavioral control, as recently as, 8/6/99. She frequently has required time out or other behavioral methods to manage disruptive behaviors. On 9/16/99, [Doe] required se-

clusion for safety of self and others after she began provoking a female peer with racial slurs. During the incident the peer physically retaliated and despite staff attempts to redirect [Doe] from further escalation she remained loud, disorganized, and delusional continuing to put herself and others at risk of harm. She was able to regain some composure and was released from seclusion after two hours. On 10/4/99, it was reported that [Doe] made a derogatory remark to a male peer who was prevented by staff from attacking her.

Participation in other therapeutic activities and classes has been poor, with minimal to no active participation. She is unable to discuss a rational plan for discharge. She is not able to appropriately discuss legal issues regarding her present hospitalization. She has refused to participate in legal proceedings or work with any public defenders assigned to her case because she did not want any, "Japanese lawyers, doctors, judge or any Filipinos present," in the courtroom. She displays minimal insight and judgment is impaired with regards to her illness and needs. She has been non-compliant with recommended medications and treatment. She has displayed impaired sleep. Hygiene and grooming have been neglected. Report noted on, 8/10/99, indicated that [Doe] has not bathed for over two weeks (19 days) and had worn the same clothes for over a week. Because of her malodorous condition, peers and staff were unable to tolerate being in her presence. She has had to eat in a separate room so as not to offend her peers, further endangering her safety. She reportedly was assaulted 8/9/99, by a peer who was disgusted by her foul body odor. Presently, she continues to bathe irregularly and frequently wears the same clothes for several days.

Dr. Henry then described the purposes, side effects, and risks associated with the antipsychotic, anticholinergic, and mood stabilizer medications that he sought court authorization to administer to Doe.

On October 21, 1999, a hearing was held on Petition 2 and the State's motion to involun-

tarily administer medication to Doe.[6] By a written order signed by Judge Fong and filed on November 12, 1999, the family court ordered that Doe be retained at HSH for "care and/or treatment ... for a period not to exceed ninety days." The family court also authorized the involuntary administration of medication to Doe, in accordance with clinically required treatment plans. The order provided, however, that "[b]efore involuntary medication or treatment is undertaken, the treating physician shall first make every attempt to secure [Doe's] cooperation and permission." Additionally, the order required that "prior to the involuntary administration of intramuscular medication, ... staff must with due diligence encourage [Doe] to take prescribed medication orally[.]"

On January 10, 2000, the State filed a Petition for Involuntary Outpatient Treatment. A Certificate of Physician was subsequently filed in support of this petition, in which Dr. Henry opined that Doe's condition had improved during the court-ordered treatment and that Doe was "capable of surviving safely in the community with available supervision from family, friends and others[.]" On January 20, 2000, following a January 19, 2000 hearing on the matter, the family court, Judge Vernon Woo presiding, entered Findings and Order of Involuntary Outpatient Treatment (the January 20, 2000 Order), finding by clear and convincing evidence that Doe was "capable of surviving safely in the community with available supervision of family, friends, and others." The January 20, 2000, Order stated, in pertinent part, as follows:

1.  That [Doe] obtain outpatient treatment for a period of 180 days, from the date of discharge of January 21, 2000.

2.  That Assertive Community Team [ (the ACT) ] is designated as the outpatient treatment psychiatrist who shall be responsible for the management and supervision of [Doe's] outpatient treatment....

3.  That at the end of the period of treatment under this [o]rder, [Doe] is automatically and fully discharged.

4.  *That [Doe] shall not be forcibly detained for treatment or physically forced to take medication.*

5.  That *if [Doe] fails or refuses to comply with this court order, i.e. refuses to obtain treatment and/or refuses to take the prescribed medication, the designated outpatient treatment psychiatrist shall so notify the [c]ourt, orally and in writing, at ... Mental Health Law Clerk, Family Court, ....*

(Emphases added.)

Apparently, when Doe read paragraph 4 of the January 20, 2000 Order and learned that she could not be physically forced to take medication, she stopped taking any. In accordance with paragraph 5 of the January 20, 2000 Order, therefore, the ACT psychiatrist who was treating Doe, Dr. Toshiyuki Shibata (Dr. Shibata), informed the family court law clerk of the situation. Advised by the law clerk that the family court lacked jurisdiction to remedy the situation, Dr. Shibata and Doe's parents then sought clarification from the family court of the January 20, 2000, Order.

When clarification of the January 20, 2000, Order was not forthcoming, the State, on May 26, 2000, filed another Petition for Involuntary Hospitalization in FC–M No. 99–0434 (Petition 3). In an accompanying Certificate of Physician, Dr. Lee Baumel (Dr. Baumel) certified that he had reason to believe that Doe was mentally ill and imminently and substantially dangerous to herself, as evidenced by the following:

1.  refuses all medications (in and outside of hospital)

2.  increasing paranoia

3.  delusional ideation re "racists"

4.  high level of agitation

5.  disruptive and intrusive on psych unit

6.  wandering off from TRAC Housing placing her at increased risk of harm

7.  poor judgment

8:  No appreciable insight

9.  may be hallucinating?

10. refuses cooperation with [the ACT]

---

**6.** The transcripts from the hearing are not con-    tained in the record on appeal.

11. parents are [Co-guardians]—but she doesn't respond to their authority either.

At a June 1, 2000, hearing on Petition 3 before Judge Carlsmith,[7] Dr. Carlton, a psychiatrist at Queen's, apparently testified that

neither he nor Dr. Baumel believed that [Doe] was imminently dangerous to herself or others. The State thereupon withdrew Petition 3 and the GAL orally moved for an Ex Parte Petition for Emergency Hospitalization of Doe to HSH, pursuant to HRS § 334–59 (Supp.2002).[8]

7. The transcript from this hearing is not contained in the record on appeal apparently "due to a malfunction with the recording device[.]" All information regarding the hearing is from a Declaration of Counsel by the deputy public defender representing Doe at the hearing.

8. HRS § 334–59 (Supp.2002) currently provides, as it did when the hearing on the Petition for Involuntary Hospitalization filed in FC–M No. 99–0434 on May 26, 2000 (Petition 3) was held, as follows:

**Emergency examination and hospitalization.** (a) Initiation of proceedings. An emergency admission may be initiated as follows:

(1) If a police officer has reason to believe that a person is imminently dangerous to self or others, or is gravely disabled, or is obviously ill, the officer shall call for assistance from the mental health emergency workers designated by the director. Upon determination by the mental health emergency workers that the person is imminently dangerous to self or others, or is gravely disabled, or is obviously ill, the person shall be transported by ambulance or other suitable means, to a licensed psychiatric facility for further evaluation and possible emergency hospitalization. A police officer may also take into custody and transport to any facility designated by the director any person threatening or attempting suicide. The officer shall make application for the examination, observation, and diagnosis of the person in custody. The application shall state or shall be accompanied by a statement of the circumstances under which the person was taken into custody and the reasons therefor which shall be transmitted with the person to a physician or psychologist at the facility.

(2) Upon written or oral application of any licensed physician, psychologist, attorney, member of the clergy, health or social service professional, or any state or county employee in the course of employment, a judge may issue an ex parte order orally, but shall reduce the order to writing by the close of the next court day following the application, stating that there is probable cause to believe the person is mentally ill or suffering from substance abuse, is imminently dangerous to self or others, or is gravely disabled, or is obviously ill, and in need of care or treatment, or both, giving the findings on which the conclusion is based, and directing that a police officer or other suitable individual take the person into custody and deliver the person to the nearest facility designated by the director for emergency examination and treatment. The ex parte order shall be made a part of the patient's clinical record. If the application is oral, the person making the application shall reduce the application to writing and shall submit the same by noon of the next court day to the judge who issued the oral ex parte order. The written application shall be executed subject to the penalties of perjury but need not be sworn to before a notary public.

(3) Any licensed physician or psychologist who has examined a person and has reason to believe the person is:

(A) Mentally ill or suffering from substance abuse;

(B) Imminently dangerous to self or others, or is gravely disabled, or is obviously ill; and

(C) In need of care or treatment;

may direct transportation, by ambulance or other suitable means, to a licensed psychiatric facility for further evaluation and possible emergency hospitalization. A licensed physician may administer such treatment as is medically necessary, for the person's safe transportation. A licensed psychologist may administer such treatment as is psychologically necessary.

(b) Emergency examination. A patient who is delivered for emergency examination and treatment to a facility designated by the director shall be examined by a licensed physician without unnecessary delay, and may be given such treatment as is indicated by good medical practice. A psychiatrist or psychologist may further examine the patient to diagnose the presence or absence of a mental disorder, assess the risk that the patient may be dangerous to self or others, or is gravely disabled, or is obviously ill, and assess whether or not the patient needs to be hospitalized.

(c) Release from emergency examination. If the physician who performs the emergency examination, in consultation with a psychologist if applicable, concludes that the patient need not be hospitalized, the patient shall be discharged immediately unless the patient is under criminal charges, in which case the patient shall be returned to the custody of a law enforcement officer.

(d) Emergency hospitalization. If the physician or the psychologist who performs the emergency examination has reason to believe that the patient is:

(1) Mentally ill or suffering from substance abuse;

(2) Imminently dangerous to self or others, or is gravely disabled, or is obviously ill; and

Over the objection of Doe's counsel, Judge Carlsmith orally granted the ex parte motion.

The next day, the GAL memorialized his oral motion by filing a written Application for Emergency Examination and Treatment, which Judge Carlsmith granted the same day. On June 5, 2000, the family court, Judge Dan T. Kochi presiding, entered an expedited order that Doe "be administered medication as prescribed by medical authorities at [Queen's] or at [HSH]" and that Doe "be held at [HSH] pending a continued hearing of this matter on June 8, 2000[.]"

On June 7, 2000, Doe filed motions to vacate the expedited order and stay the expedited order for the administration of medication and for continued hearing. Doe argued that the expedited order violated HRS § 334–59 and her "constitutional right to due process" because the order required that she be held at HSH pending a continued hearing on January 8, 2000, despite the requirement in HRS § 334–59 that a patient admitted for emergency examination and hospitalization be released within forty-eight hours of the patient's admission, unless the patient voluntarily agreed to further hospitalization. Doe's motions were denied the same day.

On June 13, 2000, Judge Carlsmith entered an Order of Dismissal that dismissed Petition 3 and confirmed her prior oral order that Doe remain hospitalized at Queen's until June 1, 2000.

### B. Family Court Proceeding FC–M No. 00–1–0444

On June 6, 2000, the State filed another Petition for Involuntary Hospitalization of Doe (Petition 4). This petition was supported by the certificates of two physicians. Dr. Bahram Taghabi (Dr. Taghabi), who had been Doe's treating psychiatrist since Doe's emergency admission to HSH on June 2, 2000, certified that Doe was mentally ill, as manifested by the following examples:

[Doe] has disorganized thinking, obsessed about racist issues, talks to herself, laughs out loud inappropriately, appears to be responding to internal stimuli; denies having any illness or any need for meds.

According to Dr. Taghabi, Doe was imminently and substantially dangerous to herself because her records reveal that she has "recently threatened to jump," had been wandering from her housing, and had poor self-care in regard to eating. Dr. Taghabi also stated that Doe was "gravely disabled or obviously ill as manifested by: [p]oor insight into mental illness, poor self[-]care, poor eating, wandering from housing." Further, Doe was "in need of care and/or treatment, ... there was no alternative available through existing facilities and programs which would be less restrictive than hospitalization[,]" and Doe was not "capable of realizing and making a rational decision with respect to [her] need for treatment." The certificate of the other physician,[9] was similar. According to this

(3) In need of care or treatment, or both; the physician or the psychologist may direct that the patient be hospitalized on an emergency basis or cause the patient to be transferred to another psychiatric facility for emergency hospitalization, or both. The patient shall have the right immediately upon admission to telephone the patient's guardian or a family member including a reciprocal beneficiary, or an adult friend and an attorney. If the patient declines to exercise that right, the staff of the facility shall inform the adult patient of the right to waive notification to the family including a reciprocal beneficiary, and shall make reasonable efforts to ensure that the patient's guardian or family including a reciprocal beneficiary, is notified of the emergency admission but the patient's family including a reciprocal beneficiary, need not be notified if the patient is an adult and requests that there be no notification. The patient shall be allowed to confer with an attorney in private.

(e) Release from emergency hospitalization. If at any time during the period of emergency hospitalization the responsible physician concludes that the patient no longer meets the criteria for emergency hospitalization the physician shall discharge the patient. If the patient is under criminal charges, the patient shall be returned to the custody of a law enforcement officer. In any event, the patient must be released within forty-eight hours of the patient's admission, unless the patient voluntarily agrees to further hospitalization, or a proceeding for court-ordered evaluation or hospitalization, or both, is initiated as provided in section 334–60.3. If that time expires on a Saturday, Sunday, or holiday, the time for initiation is extended to the close of the next court day. Upon initiation of the proceedings the facility shall be authorized to detain the patient until further order of the court.

9. We are unable to decipher the name of this physician from the physician's signature.

physician, Doe was imminently and substantially dangerous to herself, as manifested by:

Intrusive behavior towards strangers. Inflammatory, perjorative comments to strangers. Wandering off from housing, poor self[-]care and eating with weight loss.

Additionally, Doe was gravely disabled or obviously ill, as manifested by: "[p]oor self[-]care, poor eating, wandering, impaired sense of self[-]protection."

Following a hearing on June 8, 2000, the family court, Judge Carlsmith presiding, entered Findings and Order of Involuntary Hospitalization, which dismissed Petition 4 for "lack of timely filing." The next day, Judge Carlsmith issued Amended Findings and Order of Involuntary Hospitalization, which, in addition to dismissing Petition 4 for lack of timely filing, ordered Doe "held for up to 48 hours from the date of hearing for emergency hospitalization pending the filing of a petition for involuntary hospitalization, as represented by Dr. BARRY TAGHAVI [sic]."

On June 9, 2000, Doe filed a Petition for Writ of Habeas Corpus and Writ of Prohibition, requesting that the family court release her from involuntary hospitalization and enjoin the State, the GAL, and Co-guardians from circumventing "statutory involuntary hospitalization procedures by way of filing repeated Emergency Ex-parte Applications for Examination and Hospitalization." Doe's petition was denied on July 25, 2000, by the family court, Judge Richard Perkins presiding.

### C. *Family Court Proceeding FC–M No. 00–1–0452*

On June 8, 2000, while proceedings in FC–M No. 00–1–0444 were still ongoing, the State filed yet another Petition for Involuntary Hospitalization (Petition 5). In a supporting certificate filed on June 13, 2000, Dr. Taghabi stated that he had examined Doe on June 8, 2000 and had reason to believe that she was mentally ill, as manifested by the following:

Appears to be responding to internal stimuli; laughs inappropriately; bizarre thinking and appears paranoid; denies having psychiatric illness and refusing meds. Poor insight.

According to Dr. Taghabi, Doe was imminently and substantially dangerous to herself, as evidenced by the following: "Recently told brother she wanted to 'jump.' Getting into altercations with others due to calling them racist names." Doe was also "gravely disabled or obviously ill as manifested by: wandering off from board and care and history of poor self[-]care and not eating."

On June 15, 2000, the family court, Judge Carlsmith presiding, held a hearing on Petition 5.[10] At the hearing, Dr. Taghabi testified that Doe was mentally ill and suffering from "schizophrenia paranoid type." He explained that Doe "appears to be responding to internal stimuli which is exhibited by laughing inappropriately, talking to herself and making remarks that are more out of the context of someone talking to themselves...." Doe also had a "thought disorder" and was unable "to maintain any meaningful interaction with other people." Additionally, Doe was "paranoid about certain races of people." To treat Doe's disorder, Dr. Taghabi had prescribed "xyprexa (phonetic spelling)," an antipsychotic medication that "helps with the positive symptoms of psychosis such as hallucinations and delusions and also helps with negative symptoms such as blunted (sic) affect, apathy for the external environment and ambivalence, difficulty making decisions and lack of expression affect." Dr. Taghabi opined that based on past reports and Doe's own statements, there was "very little chance" that Doe would take medications if she were not in HSH. When Dr. Taghabi was asked whether Doe could be dangerous to herself if she were released, the following colloquy ensued:

Q. Dr. Taghabi, do you have an opinion whether [Doe] would be dangerous to herself or others if released today?

---

**10.** The Family Court of the First Circuit took judicial notice of the related files in FC–M Nos. 99–0434 and 00–1–0444.

A. Yes, I have an opinion.

I think she would be dangerous to herself based on her current behaviors in the ward and also problems that were reported with her past behaviors when she was outside of the hospital.

When she was outside the hospital the report that I've got from her Guardian and also from the—

[DOE'S ATTORNEY]: Objection, Hearsay.

THE COURT: I'll overrule.

Proceed.

THE WITNESS: The report that I've received is her initial report and also from her Guardian said that she was—she has been enticing and provoking other patients where she was living to the point where they had become very angry.

And I have gotten a report that they have—there has been incidents of physical altercation. That she had been hit.

And also she's walking out in the streets, wandering off and going up to total strangers and—and calling them derogatory racist remarks which could place her at significant risk.

If someone doesn't understand that she's mentally ill they could take that very personally and they could try to, you know, hurt her.

On the ward I've seen the same kind of behavior. She has been getting other patients upset and arousing the other patients and—by going up to them and calling them racist remarks.

And also she's been doing this with the staff also. And this is again part of her obsessive—obsessive part of her illness of schizophrenia that her fear is geared towards racist issues.

. . . .

Q. Has this behavior about her going—you mentioned about going up to patients and staff and saying derogatory things straight to—right to their face?

A. Yes.

Q. Has that changed at all this week? Has that happened this week?

A. It has happened this week, yes.

For example, we had a—a master treatment plan and she—we invited her to come in and talk to us about our treatment plan and she looked at the window and said, "I don't (indiscernible) .... coming in because there are white people in there."

Q. 'Cause there are what in there?

A. "White people in there. I don't want to be with white people" (inaudible, the witness drops voice). . . .

Then towards the—one of the staff she went up to her and said—made racist remarks towards her and she has also done that to other patients.

And the other patients have become very upset and it's—it's—you know, it's putting her at risk also on the unit so we have to—you know, we have to watch her.

Q. Is the staff intervening when this—when this sort of things happens with the (indiscernible, simultaneous conversation). . . .

A. She's redirected verbally and (inaudible) .... to do that. That's about it right now.

Q. Are there any other examples or concerns you have about her being a danger to herself if she were released today?

A. Not that I can think of.

Dr. Taghabi also testified that Doe was living in a twenty-four-hour supervised locked unit at HSH, where "she can't leave the quarters." This setting kept Doe "from wandering off and provoking other people or strangers who may retaliate against her racist remarks." The secure setting also prevented Doe "from being non-compliant with medications by encouraging that she take medications hopefully long enough for her to get better and have insight into her illness and be compliant with medications so that once she is released eventually she will be compliant with medications."

On cross-examination, Dr. Taghabi testified that he was not aware that Doe's previous doctor had found that Doe was not imminently dangerous to herself. Dr. Taghabi also admitted that Doe had not expressed

"suicidal ideations" [11] or "homicidal ideations" and had not physically harmed the staff or other patients. The doctor believed that Doe was a danger to herself because it was "probable" that Doe's racist remarks would result in retaliation, causing bodily injury. Additionally, he had

> received word from [Doe's] mother that [Doe] while she was at a cottage here at [HSH] after discharge in January there was an episode where she turned on the burners where she was living and left them on. And that is something that has occurred but that's something that also should be noted that could potentially be a great risk for others[.]

Dr. Taghabi admitted that he had not substantiated whether the incident described by Doe's mother had actually occurred. Additionally, he acknowledged that he had no special training or qualifications to qualify him as an expert on how society would react to Doe's racist remarks. Finally, Dr. Taghabi related that he had not personally observed Doe go up to other patients and make racist remarks, so his testimony was based on information provided by nurses.

Doe's mother then testified that when Doe was released from HSH to the ACT program on January 21, 2000, she was placed in an emergency shelter "for what was supposed to be a few days to a week," until she could be placed in a community home. However, "when [Doe] got the discharge order saying that she could not be forcibly medicated and read the house rules[,] she decided she was not going to take any more medication." As a result, she could not be placed in a community home and ended up at a forensic cottage on HSH grounds.

Doe's mother related that on or about April 10, 2000, she dropped Doe off in ʻĀina Haina for a job interview. Doe was supposed to catch the bus after the interview and go back to the HSH cottage. However, Doe apparently missed the bus, did not return to the cottage, and spent the entire night in Chinatown without calling to inform anyone about her whereabouts. Regarding Doe's racist remarks, Doe's mother testified that she was not aware of any actual altercations resulting from Doe's behavior. Upon further questioning, Doe's mother testified:

Q. Have you actually witnessed—ever witnessed her—her behaviors of saying racial remarks to strangers?

A. I have been with her many times although not–no. When she was in the cottages she knew the staff and she would make racial remarks.

But I would take her shopping before her initial Hawaii State hospitalization and be in very public places and she would make very loud remarks regarding Japanese and Filipinos when we were in areas with very high population of those two nationalities; in the Waipahu area or in public, large public shopping centers.

Q. How did—how did that make you feel?

A. Very uncomfortable. I would tell her, "[Doe], please don't make those kind of remarks. Be quiet. Don't say anything."

And [Doe's] retention level and ability to control her behavior is sometimes about ten seconds. Sometimes she can manage for about ten minutes or fifteen minutes but then she would lose control again.

In addition, Doe's mother testified that Doe posed an additional danger to herself because in the past, she had refused to eat, based on a belief that the food was poisoned.

When asked whether Doe would be able to go home with her if released, Doe's mother responded: "No. Her behavior is not such that I could deal with it and it would be a definite danger to her father because of his medical problems that have gotten worse over the last year." Doe's mother explained that Doe's father was under medication for a number of medical ailments. "[Doe] has the idea that nobody should be taking medication and at one point quite a few years ago . . .

---

**11.** The testimony of Dr. Bahram Taghabi (Dr. Taghabi) that Doe had *not* expressed "suicidal ideations" conflicts with his certificate in support of the Petition for Involuntary Hospitalization filed on June 8, 2000 (Petition 5), which stated that Doe had recently told her brother that "she wanted to jump." Dr. Taghabi never explained Doe's alleged threat to jump, and there was no testimony at the hearing on Petition 5 about the alleged threat.

[Doe's father] was given an antibiotic for an infection and [Doe] threw it away." When asked what kind of living situation would be set up for Doe if she were released, Doe's mother responded:

> We have secured some disability income payments for her from social security against her wishes and that would be the only thing I could think of that might help to pay a rent but I don't think she would be in a good situation to live by herself.

Following closing arguments by the State, Doe, and the GAL, the family court orally ruled that: (1) Doe was "substantially dangerous and imminently dangerous to herself in that she has made the—and continues to by refusing to take her medicine, making remarks that are uncontrolled, inflammatory, racial in situations where it is probable they will result in assaults that certainly could result in bodily injury and/or anything even more serious than that"; (2) Doe was mentally ill beyond a reasonable doubt in that she suffered from schizophrenia paranoid type; (3) Doe was in need of care and treatment by clear and convincing evidence; and (4) Doe cannot be placed elsewhere than HSH because there was no suitable environment less restrictive than hospitalization where Doe could be administered medications involuntarily.

On June 19, 2000, the family court entered Order 1, ordering that Doe be admitted to HSH for a period not to exceed ninety days. The family court found, in relevant part, as follows:

I. [Doe] is mentally ill, beyond a reasonable doubt, in that [Doe] suffers from Schizophrenia, paranoid-type[.]

. . . .

J. [Doe] is imminently and substantially dangerous to self, by clear and convincing evidence, in that [Doe] recently has behaved in such a manner as to indicate that the person is unable, without supervision and the assistance of others, to satisfy the need for nourishment, essential medical care, shelter or self-protection, so that it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded, i.e., by refusing to take medications and chronically making racist, loud, inflamatory [sic] remarks to strangers which are very provoking and which are likely/probably to cause dangerous retaliation[.]

. . . .

K. [Doe] is in need of care and/or treatment, by clear and convincing evidence.

L. [Doe] is unable to be placed elsewhere because at present there is no suitable alternative where involuntary medications can be administered available through existing facilities and programs which would be less restrictive than hospitalization, by clear and convincing evidence.

M. [Doe] should be committed to a psychiatric facility.

On June 21, 2000, Doe filed a notice of appeal from Order 1. This appeal was designated as appeal No. 23534.

Thereafter, on August 17, 2000, the State filed a Repetition for Involuntary Hospitalization (Petition 6), seeking to continue Doe's involuntary hospitalization. In a Certificate of Physician attached to the Repetition, Dr. Janus Smolinski (Dr. Smolinski), expressed his belief that Doe was mentally ill and imminently and substantially dangerous to herself, as evidenced by the following:

> [Doe] has been making racial accusatory comments towards Phillipinos [sic] numerous times a day. The comments are insulting and provoking strong reactions from others. If she made these comments in the community, she would most likely be assaulted by someone within a short period of time. On 8/12/00 she wanted to physically fight with a peer after verbal altercation.

On August 24, 2000, the family court, Judge Aiona presiding, held a hearing on Petition 6. Dr. Smolinski testified that in his opinion, Doe was mentally ill and suffering from schizoaffective disorder, bipolar type. Dr. Smolinski was asked whether Doe was dangerous to herself or others, and the following colloquy ensued:

Q Dr. Smolinski, do you have an opinion whether [Doe] would be dangerous to herself or others if released today?

A Yes, I believe she would.

Q And it would dangerous [sic] to herself or others?

A Uh, to self and others.

Q What is the basis of your opinion?

A Okay. Well, she makes very strong racial remarks and she went and would be in the community and walk up to somebody of that ethnicity and make very strong remarks, you know, that somebody is—how much she hates and dislikes and that they are conspiring against her with loud voice and very close to somebody, getting literally in somebody's face, and she would most likely be assaulted sooner or later.

Q Why do you say that she would be a danger to others?

A Well, there was a—some physical—a threatened behavior. I don't know all the details but on the unit.

[DOE'S ATTORNEY]: I object as to hearsay (inaudible).

THE COURT: Okay. The objection—

. . . .

[THE STATE'S ATTORNEY]: Your Honor, the witness is an expert and he's allowed to testify as to hearsay.

THE COURT: That's true.

. . . .

THE COURT: The objection's overruled.

Q [BY THE STATE'S ATTORNEY]: And how did you get the information about the incident?

A Just from staff.

Q You're the author of the certificate of physician that was filed on August 21st?

A Yes.

Q Okay. That was written on August 16?

Okay. You mentioned in there August 12th she wanted to physically fight with a peer after verbal altercation. Is that the visit you're talking about?

A Yes, that's the one.

Q Do you have any more details as to from your experience and from the information you got from staff as to what happened in that?

A I don't have all the details. I don't know. But the story is that when she, let's say, made some remarks, somebody responds. Then there will be some verbal exchange of verbal communication and she could get to the point that she could become assaulted.

Q So she didn't back down and walk away from this incident from your understanding?

A No. And my understanding is that it is very protective environment here so that if anything is happening like what happened on the 12th then the staff intervenes and the patient (inaudible) to different locations.

Q So the staff intervenes to prevent these things from happening here?

A Yes.

Q Okay. In your certificate of physician you also made—discussed something about unable to provide for food or clothing or shelter or make reasonable decisions regarding her care. Could you explain that.

A Yes. That she would be unable to take care of herself. If she would be discharged, it means providing for—arranging for a place to live and then going and shopping and organizing in a way that she could do something, cook for herself or organize a (inaudible). And we all shop for clothing so (inaudible) for herself.

Q Um-hmm. And why is that?

A A secondary (inaudible) disorganization that she would be unable to put basically her thoughts together to the point that she could go that it would be—the example, let's say she would be in an apartment and she would have to organize her thoughts. Okay. So what do I have to do? I need food so I have to pay the checkbook (inaudible). And it requires some executive functioning on a level that she to my (inaudible) would be unable to do it.

On cross-examination, Dr. Smolinski was questioned about the details of the August 12th incident that he testified about in which

Doe had allegedly wanted to physically fight with a peer. Dr. Smolinski admitted, after examining the progress notes in Doe's HSH clinical chart, that there was no entry for August 12. Dr. Smolinski also acknowledged that the incident upon which he based his opinion that Doe's racial remarks could endanger herself occurred on August 7. The following colloquy regarding the incident then ensued:

Q Okay. And regarding that incident is it correct that in the progress notes it mentioned that [Doe] was redirected after the other patient called [Doe] a bitch? Is that correct?

A Yes, that's correct.

Q Okay. And the redirection was verbal, not physical redirection; is that correct?

A Yes, that's correct.

Q Okay. And in that progress note there's no mention of [Doe] making any kind of racial remark; is that correct?

A I don't see any racial remarks.

Q Okay. And regarding the actual—her actual wanting to fight, isn't it correct that what [Doe] said was—what she asked the staff is if her and this other patient could engage in a supervised sparring match to relieve stress?

A Yes.

Q That's correct? Okay.

And that's the incident that you're talking about—

A Yes.

Q Okay. And after being informed that that was not possible, there was no further incident; is that correct?

A I'm not aware of.

Q And could I direct your attention to the next entry at 24:00 hours.

A Yes.

Q It indicates that [Doe], regarding her emotional control, that she was redirectable (inaudible) just—but inappropriate verbally; is that correct?

A Yes.

Q Okay. And regarding these racial remarks that you testified to, can you be a little bit more specific as to what type of remarks? Are they personal attacks on the person like, you know, for instance like "You dumb F"in Japanese" or what kind of statement is it pertaining to?

A Well, it's a—when—when I talk to her and she makes statements—statements—general statements against me, you know, Chinese. And then when (inaudible) when she sees somebody she makes a comment in regard to their specific Asian, start addressing by their race.

Q Okay.

A So it's not—it's not like talking about that specific person, talking about that particular person, it's talking about that person but then it was of their race.

Q Uh-huh.

A So it's not specifically discussing some specifics of that person.

Q Okay. So she's basically verbalizing her opinions about race—

A Yes.

Q —when she sees somebody of that race?

A But then directed it towards a specific person.

Q On that person. Okay.

A But not specifics about that person.

Q Okay. And with these incidents, is it true that [Doe] is easily redirected? Have you ever had to physically redirect her is what I'm asking?

A I—in my understanding is, yes, that she's redirected verbally—

Q Verbally.

A—when something has happened.

Q Okay. Is it correct that other than the perceived danger from her racial statement that [Doe] otherwise demonstrates safe behavior?

A Well, racial and then, yeah, the incidents going to the beginning of August when she wanted to basically fight with the other patients. So then it was not racial (inaudible).

Q That's the incident you're talking about—

A Yes.

Dr. Smolinksi further testified that Doe had not experienced any "homicidal ideations" or "suicidal ideations[.]"

The only other witness for the State was Doe's brother, who related that during a court recess, "[Doe] had mentioned a previous ex-girlfriend who is of Filipino descent and blames me for her cause on—how should I say? Blames for the reasons of her being in here and blaming her because she is of Filipino descent it is her fault that she's in here and that I should be in this area."

Doe called as a witness Rosemary Calego (Calego), "a team leader for the [ACT]." Calego testified that if Doe were released from HSH, the ACT would assist her in getting accustomed to living independently, finding Doe a place to live, and managing Doe's medication.

The family court orally ruled, in relevant part, as follows:

... I find beyond a reasonable doubt that [Doe] is suffering from mental illness.

As to whether or not clear and convincing evidence has been presented to show that she is imminently and substantially dangerous, I don't believe that there's a time frame on imminently—on imminent. I don't believe there's a time frame on recent past. However, obviously I think if you use common sense and common notions towards these terms, it's not something that happened a year ago or two years ago but the reference at this hearing that I've allowed evidence on is from the month of June I believe it was that I let it be established, from the month of June to recently.

There is a fine line between one's racial views and whether or not it is a—what is being said now is a relation to her mental illness. And it was testified that her comments are delusions of persecution and paranoia relating to race. . . .

As far as the imminency of it, it appears that her behavior may be getting better, and that would only be from the fact that there is no real documentation within the past month relating to specific terms that she has used relating to race and threats. But obviously we had the testimony of her brother today in which she reiterated something relating to race and her situation. That in my mind is an indication of possible delusion of persecution.

It's obviously not a threat. There was no threat saying that I am going to do something to that person because of it. But I think it all falls in line with what the doctor has stated as to his opinion as to how she is placing herself in a position of imminent and substantial danger to herself or possibly others. So I find that element to be met.

As far as the need of care, the testimony is clear. Again, if the record bears me differently on this that the [ACT] leader here did not state that she would be eligible for housing or any other type of—I should say for housing as opposed to care. She did testify that they would provide whatever services they had and that she was eligible for those services such as monitoring of medication as well as possible service referral. But as far as housing, there was no testimony that she would be eligible for that and placed at this point in time if she were released on ... August 31st of this year.

It appears at this point in time that another concern is the compliance with medication and there is a doubt as to whether that is being done. And this seems to be the only setting at this point in time in which that can be monitored and then seeing if it, uh—if it having any type of significant effect on her delusions of persecution and paranoia and, if not, why?

And so accordingly I will grant the petition for a period of 90 days or sooner.

On October 3, 2000, the family court entered its Order 2, in which the family court found, in pertinent part, as follows:

G [Doe] is mentally ill, beyond a reasonable doubt, in that the Subject suffers from Schizoaffective disorder, bi-polar type[.]

. . . .

H [Doe] is imminently and substantially dangerous to others, by clear and convincing evidence, in that at the hearing [Doe] stated to her brother her belief that his Filipino girl friend and he are

the reason for her being in the hospital. This confirms the diagnosis of mental illness (Delusions of Persecution) and inappropriate and hostile actions towards Filipinos, again which is needed to diagnose mental illness.

I  [Doe] is in need of care and/or treatment, by clear and convincing evidence.

J  [Doe] is unable to be placed elsewhere because at present there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization, by clear and convincing evidence.

K  [Doe] should be committed to a psychiatric facility.

The family court then ordered that Doe be involuntarily committed to HSH for a period not to exceed ninety days. Doe filed a timely amended notice of appeal from Order 2 on October 19, 2000. This appeal was designated as appeal No. 23806.

## DISCUSSION

### A. *The Constitutional Boundaries for Civil Commitment of the Mentally Ill*

■ The United States Supreme Court has recognized that "civil commitment [of the mentally ill] for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The loss of a civil committee's autonomy is justified on the basis of two compelling societal interests:

> The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

*Id.* at 426, 99 S.Ct. 1804.

The first Supreme Court decision to discuss any constitutional restrictions on civil commitment proceedings was *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). In *O'Connor*, the respondent, Donaldson, had been involuntarily confined in a mental institution for almost fifteen years. During his confinement, Donaldson had repeatedly "demanded his release, claiming that he was dangerous to no one, that he was not mentally ill, and that, at any rate, the hospital was not providing treatment for his supposed illness." *Id.* at 565, 95 S.Ct. 2486. He subsequently filed a lawsuit under 42 U.S.C. § 1983, claiming that members of the hospital staff had "intentionally and maliciously deprived him of his constitutional right to liberty." *Id.* at 563, 95 S.Ct. 2486.

The evidence adduced at trial "demonstrated, without contradiction, that Donaldson had posed no danger to others during his long confinement, or indeed at any point in his life." *Id.* at 568, 95 S.Ct. 2486. There was no evidence adduced "that Donaldson had ever been suicidal or been thought likely to inflict injury upon himself." *Id.* Furthermore, "Donaldson's frequent requests for release had been supported by responsible persons willing to provide him any care he might need on release[,]" and the record showed that despite his apparently mild paranoid schizophrenia, Donaldson had been able, both before and after his commitment, to "earn his own living outside the hospital" through a "responsible job in hotel administration." *Id.* Finally, the evidence established that Donaldson's "confinement was a simple regime of enforced custodial care, not a program designed to alleviate or cure his supposed illness." *Id.* at 569, 95 S.Ct. 2486.

A jury returned a verdict in Donaldson's favor, which was affirmed by the Fifth Circuit Court of Appeals, and the hospital's superintendent appealed. The Supreme Court held that "[t]he fact that state law may have authorized confinement of the harmless mentally ill does not itself establish a constitutionally adequate purpose for the confinement." *Id.* at 574, 95 S.Ct. 2486. Additionally, the Supreme Court stated, even if Donaldson's original involuntary confinement was constitutionally permissible, such confinement "could not constitutionally continue after that basis no longer existed." The Court reasoned as follows:

> A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinite-

ly in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

*Id.* at 575, 95 S.Ct. 2486. In a series of rhetorical questions and answers, the Supreme Court fleshed out its holding:

May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But *the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution.* Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends. See *Shelton v. Tucker,* 364 U.S. 479, 488–490, 81 S.Ct. 247, 252–253, 5 L.Ed.2d 231.

May the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might as well ask if the State, to avoid public unease, could incarcerate all who are physically unattractive or socially eccentric. *Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty.* See, e.g., *Cohen v. California,* 403 U.S. 15, 24–26, 91 S.Ct. 1780, 1787–1789, 29 L.Ed.2d 284; *Coates v. City of Cincinnati,* 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214; *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365–1366, 22 L.Ed.2d 572; cf. *U.S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 2825–2826, 37 L.Ed.2d 782.

In short, *a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members*

*or friends.* Since the jury found, upon ample evidence, that O'Connor, as an agent of the State, knowingly did so confine Donaldson, it properly concluded that O'Connor violated Donaldson's constitutional right to freedom.

*Id.* at 575–76, 95 S.Ct. 2486 (emphases added). The *O'Connor* Court specifically refused to decide certain issues that are raised by the facts in this case:

[T]here is no reason now to decide ... whether the State may compulsorily confine a non-dangerous, mentally ill individual for the purpose of treatment.

... We need not decide whether, when, or by what procedures, a mentally ill person may be confined by the State on any of the grounds which, under contemporary statutes, are generally advanced to justify involuntary confinement of such a person—to prevent injury to the public, to ensure his [or her] own survival or safety, or to alleviate or cure his [or her] illness.

*Id.* at 573–74, 95 S.Ct. 2486. The Court did, however, recognize that "dangerous conduct" might include evidence of gross self-neglect:

Of course, even if there is no foreseeable risk of self-injury or suicide, a person is literally 'dangerous to himself' if for physical or other reasons he [or she] is helpless to avoid the hazards of freedom either through his [or her] own efforts or with the aid of willing family members or friends.

*Id.* at 574 n. 9, 95 S.Ct. 2486.

Subsequently, in *Addington v. Texas,* the Supreme Court held that an "individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." 441 U.S. at 427, 99 S.Ct. 1804. The *Addington* Court held that the "proof beyond a reasonable doubt" standard was not required in such proceedings "because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment." *Id.* at 432, 99 S.Ct. 1804. Instead, due process guarantees are satisfied as long as the standard of proof

applied is at least equal to or greater than the clear and convincing standard. *Id.* at 431–33, 99 S.Ct. 1804.

In *Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), the petitioner, who suffered from "Schizophrenia, paranoid type," was arrested for attempting to steal a jacket from a department store. He was then charged with attempted petit larceny, a misdemeanor punishable by a maximum prison term of one year. Upon his acquittal by reason of insanity, the petitioner was committed indefinitely to a mental hospital, pursuant to a District of Columbia statute adopted by Congress to protect society and rehabilitate insane criminals. *Id.* at 356 n. 2, 103 S.Ct. 3043. After being hospitalized for more than one year, the maximum period he could have spent in prison if he had been convicted, the petitioner sought his release. In determining that the petitioner was not entitled to be released, the United States Supreme Court concluded:

> We turn first to the question whether the finding of insanity at the criminal trial is sufficiently probative of mental illness and dangerousness to justify commitment. A verdict of not guilty by reason of insanity establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness. Congress has determined that these findings constitute an adequate basis for hospitalizing the acquittee as a dangerous and mentally ill person.... We cannot say that it was unreasonable and therefore unconstitutional for Congress to make this determination.
>
> *The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness.... Indeed, this concrete evidence generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding. We do not agree with petitioner's suggestion that the requisite dangerousness is not established by proof that a person committed a non-violent crime against property. This Court never has held that "violence," however*

> *that term might be defined, is a prerequisite for a constitutional commitment.*
>
> Nor can we say that it was unreasonable for Congress to determine that the insanity acquittal supports an inference of continuing mental illness. It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment. The precise evidentiary force of the insanity acquittal, of course, may vary from case to case, but the Due Process Clause does not require Congress to make classifications that fit every individual with the same degree of relevance.

*Id.* at 363–66 (emphasis added, citations and footnotes omitted). In a footnote, the Supreme Court emphasized that "dangerousness" should not be equated with "violence":

> To describe the theft of watches and jewelry as 'non-dangerous' is to confuse danger with violence. Larceny is usually less violent than murder or assault, but in terms of public policy the purpose of the statute is the same as to both." (footnote omitted). It also may be noted that crimes of theft frequently may result in violence from the efforts of the criminal to escape the victim to protect property or the police to apprehend the fleeing criminal.

*Id.* at 365 n. 14, 103 S.Ct. 3043 (quoting *Overholser v. O'Beirne*, 302 F.2d 852, 861 (1961)) (internal brackets and quotations marks omitted).

In *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), the United States Supreme Court, in a five-four decision, held unconstitutional a Louisiana statute that allowed the continued confinement in a psychiatric hospital of an insanity acquittee who had recovered from his mental illness but was still thought to be dangerous due to an antisocial personality. *Id.* at 77–80, 112 S.Ct. 1780.

The petitioner in *Foucha* had been committed to a mental institution after being found not guilty by reason of insanity of aggravated burglary and illegal discharge of a firearm. Approximately four years later, the hospital superintendent recommended the petitioner's discharge or release after a

hospital review panel concluded "that there had been no evidence of mental illness since admission and recommended that [petitioner] be conditionally discharged." *Id.* at 74, 112 S.Ct. 1780. At a hearing, one of the doctors testified that petitioner "probably suffered from a drug[-]induced psychosis but that he had recovered from the temporary condition; that he evidenced no signs of psychosis or neurosis and was in 'good shape' mentally; that he had, however, an antisocial personality, a condition that is not a mental disease and that is untreatable." *Id.* at 75, 112 S.Ct. 1780. The doctor also testified that he would not "feel comfortable in certifying that [petitioner] would not be a danger to himself or other people" because the petitioner had been involved in "several altercations" while at the institution. *Id.* at 75, 112 S.Ct. 1780. On such a record, the trial court concluded that the "[petitioner] was dangerous to himself and others and ordered him returned to the mental institution." *Id.*

After granting *certiorari*, the United States Supreme Court majority observed that "[w]hen a person charged with having committed a crime is found not guilty by reason of insanity, . . . a State may commit that person without satisfying the *Addington* burden with respect to mental illness and dangerousness." *Id.* at 76, 112 S.Ct. 1780 (citing *Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983)). The justification is that the verdict establishes that: (1) the defendant "committed an act" constituting a "criminal offense"; and (2) he or she committed this act because of a mental illness. *Id.* Accordingly, "it could be properly inferred that at the time of the verdict, the defendant was still mentally ill and dangerous and hence could be committed." *Id.* However, "the committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous[.]" *Id.* at 77, 112 S.Ct. 1780 (quoting *Jones*, 463 U.S. at 363, 103 S.Ct. 3043). The Supreme Court held that because the basis for holding the petitioner in a psychiatric facility had dissipated, i.e., he was no longer mentally ill, the state was "no longer entitled to hold him on that basis." *Id.* at 78, 112 S.Ct. 1780. Additionally, the state could not justify his continued confinement on the basis of his antisocial personality, because: (1) no determination had been made in a civil commitment proceeding of petitioner's current mental illness and dangerousness; (2) "if [petitioner] can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement"; and (3) his confinement violated his substantive due process rights in that the state did not prove, by clear and convincing evidence, that he was mentally ill and dangerous but conceded that he was not mentally ill.[12] *Id.* at 78–80, 112 S.Ct. 1780.

---

12. In *State v. Miller*, 84 Hawai'i 269, 933 P.2d 606 (1997), the Hawai'i Supreme Court held that HRS § 704–411(4) (1993), which places the burden on an insanity acquittee to establish his or her fitness to be released from a psychiatric facility by a preponderance of the evidence, did not violate due process. *Id.* at 275, 933 P.2d at 612. The court distinguished *Foucha* as follows: . . . *Foucha* did not squarely address the constitutionality of placing the burden of proof on the insanity acquittee at the release hearing. However, a careful reading of that case indicates that the Supreme Court tacitly approved of such a procedure. For instance, the Court in *Foucha* relies heavily on *Jones* and its disparate treatment of insanity acquittees. The Court stated that so long as there is a legitimate basis for the continuing confinement of the insanity acquittee, the insanity acquittee may be treated differently from the civilly committed individual. 504 U.S. at 85, 112 S.Ct. at 1788. In the instant case, the state has alleged and argued that Miller, unlike Foucha, is still suffering from a mental illness that renders him dangerous. Therefore, because the state continues to have a legitimate reason to keep Miller in the mental facility, it may require him to prove his eligibility for release.

The *Foucha* court also meticulously distinguished *Foucha* from an insanity acquittee, instead of invalidating the Louisiana statute on its face. The Court held the Louisiana statute unconstitutional largely because, "the basis for holding Foucha in a psychiatric facility as an insanity acquittee had disappeared" when Louisiana acknowledged that Foucha was no longer mentally ill. *Id.* at 78, 112 S.Ct. at 1784. It logically follows that if Louisiana had successfully argued that Foucha was still mentally ill, as the state did in this case, Louisiana would have had a sufficient basis to recommit Foucha.

Finally, conspicuously absent from *Foucha* is a holding that the state must provide the same release procedures for insanity acquittees and civil committees. Given that the issue in *Foucha* was an insanity acquittee's petition for

In a more recent case, *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Supreme Court was called upon to review the constitutionality of the Kansas Sexually Violent Predator Act, Kan. Stat. Ann. § 59–29a01 *et seq.* (1994), which established "procedures for the civil commitment of persons who, due to a 'mental abnormality' or a 'personality disorder,' are likely to engage in 'predatory acts of sexual violence.' " *Id.* at 350, 117 S.Ct. 2072 (quoting Kan. Stat. Ann. § 59–29a01 et seq. (1994)). Under the Act, "mental abnormality" was defined as a " 'congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.' " *Id.* at 352, 117 S.Ct. 2072 (quoting Kan. Stat. Ann. § 59–29a02(b)).

After its passage, the Kansas Act was invoked to involuntarily commit Leroy Hendricks (Hendricks), an inmate with a long history of sexually molesting children, shortly before he was scheduled to be released from prison. Upon Hendricks' challenge to his commitment on due process, double jeopardy, and *ex post facto* grounds, the Kansas Supreme Court invalidated the Act, holding that the Act's "precommitment condition of a 'mental abnormality' did not satisfy what the court perceived to be the 'substantive' due process requirement that involuntary civil commitment must be predicated on a finding of 'mental illness.' " *Id.* at 350, 117 S.Ct. 2072 (quoting *In re Hendricks*, 259 Kan. 246, 912 P.2d 129, 138 (1996)).

The United States Supreme Court reversed, holding that the procedures followed by Kansas met substantive due process requirements in that the Act "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Id.* at 358, 117 S.Ct. 2072.

release, we find the Court's silence to be persuasive evidence of its approval of the different

Responding to Hendricks' argument that a finding of "mental illness" was a prerequisite for civil commitment and that "mental abnormality is *not* equivalent to a 'mental illness' because it is a term coined by the Kansas Legislature, rather than by the psychiatric community[,]" (*id.* at 359, 117 S.Ct. 2072, emphasis in original), the Supreme Court stated:

> Contrary to Hendricks' assertion, the term "mental illness" is devoid of any talismanic significance. Not only do "psychiatrists disagree widely and frequently on what constitutes mental illness," *Ake v. Oklahoma*, 470 U.S. 68, 81, 105 S.Ct. 1087, 1095, 84 L.Ed.2d 53 (1985), but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement. *See, e.g., Addington, supra*, at 425–426, 99 S.Ct., at 1808–1810 (using the terms "emotionally disturbed" and "mentally ill"); *Jackson v. Indiana*, 406 U.S. 715, 732, 737, 92 S.Ct. 1845, 1855, 1857–1858, 32 L.Ed.2d 435 (1972) (using the terms "incompetency" and "insanity"); cf. *Foucha*, 504 U.S., at 88, 112 S.Ct., at 1789–1790 (O'CONNOR, J., concurring in part and concurring in judgment) (acknowledging State's authority to commit a person when there is "some medical justification for doing so").
>
> *Indeed, we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance.* Cf. *Jones v. United States*, 473 [463] U.S. 354, 365, n. 13, 103 S.Ct. 3043, 3050, n. 13, 77 L.Ed.2d 694 (1983). As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community. The legal definitions of "insanity" and "competency," for example, vary substantially from their psychiatric counterparts....

standards of proof at the release proceeding.

548

To the extent that the civil commitment statutes we have considered set forth criteria relating to an individual's inability to control his dangerousness, the Kansas Act sets forth comparable criteria and Hendricks' condition doubtless satisfies those criteria. The mental health professionals who evaluated Hendricks diagnosed him as suffering from pedophilia, a condition the psychiatric profession itself classifies as a serious mental disorder.... [3]

---

[3] We recognize, of course, that psychiatric professionals are not in complete harmony in casting pedophilia, or paraphilias in general, as "mental illnesses." Compare Brief for American Psychiatric Association as *Amicus Curiae* 26 with Brief for Menninger Foundation et al. as *Amici Curiae* 22–25. These disagreements, however, do not tie the State's hands in setting the bounds of its civil commitment laws. In fact, *it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes.* Cf. *Jones v. United States,* 463 U.S. 354, 365, n. 13, 103 S.Ct. 3043, 3050, n. 13, 77 L.Ed.2d 694 (1983). *As we have explained regarding congressional enactments, when a legislature "undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation."* *Id.,* at 370, 103 S.Ct., at 3053(internal quotation marks and citation omitted).

*Id.* at 359–60, 117 S.Ct. 2072 (emphases added, citations omitted).

Subsequently, in *Kansas v. Crane,* 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), the Supreme Court was asked by the State of Kansas to review the Kansas Supreme Court's application of *Hendricks* to the civil commitment of Michael Crane (Crane), a previously convicted sexual offender who suffered from both exhibitionism and antisocial personality disorder. The Kansas Supreme Court had held that Crane could not be civilly committed under the Kansas Sexual Predator Act absent a finding that he was completely unable to control his dangerous behavior. *Id.* at 410, 122 S.Ct. 867.

On appeal, the United States Supreme Court explained that *Hendricks* did not require *"total* or *complete* lack of control" on the part of a civil committee. *Id.* at 411, 122 S.Ct. 867 (emphases in original). Such "an absolutist approach is unworkable," the Supreme Court said, for "[i]nsistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities." *Id.* at 411–12, 122 S.Ct. 867. On the other hand, the Supreme Court stated, the Constitution does not "permit commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination." *Id.* at 412, 122 S.Ct. 867. The Supreme Court elaborated as follows:

[W]e did not give to the phrase "lack of control" a particularly narrow or technical meaning. And we recognize that in cases where lack of control is at issue, "inability to control behavior" will not be demonstrable with mathematic precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case....

We recognize that *Hendricks* as so read provides a less precise constitutional standard than would those more definite rules for which the parties have argued. But *the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules. For one thing, the States retain considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for commitment.... For another, the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever— advancing science, whose distinctions do not seek precisely to mirror those of the law.*

*Id.* at 413, 122 S.Ct. 867 (emphasis added, citations omitted).

■ In summary, under United States Supreme Court case law, a state cannot constitutionally confine a person based solely on antisocial behavior. In order to civilly commit an individual, there must be at least clear

and convincing evidence that the individual is "mentally ill" and "dangerous." Unfortunately, the Supreme Court has not provided any bright-line rules as to what constitutes "mental illness" or "dangerousness," and courts all over the country have struggled with these issues. The Supreme Court has stated, however, that much deference should be accorded to state legislatures to define these terms. Moreover, in *Jones* and *O'Connor*, the Court stated that "dangerousness" is not the equivalent of violence. It appears under *O'Connor*, moreover, that a mentally ill person incapable of "surviving safely in freedom by himself [or herself] or with the help of willing and responsible family members or friends" may be constitutionally confined.

With the foregoing constitutional backdrop, we turn to an examination of the Hawai'i statutes that govern involuntary hospitalization of the mentally ill.

### B. Hawai'i's Statutory Framework for Involuntary Hospitalization

Hawai'i's statutory framework for involuntary hospitalization of the mentally ill has evolved over the last half century, prompted in large part by developments in case law and emerging social service models for dealing with the mentally ill in a more humane and rational manner.

Prior to 1967, Hawai'i's commitment statutes were based on a "legal model," in which a court order was necessary to involuntarily hospitalize a mentally ill person requiring institutional care. *See* Rev. Laws Haw. §§ 81–19 and 81–21 (1955).

In 1967, the Hawai'i legislature enacted into law, effective January 1, 1968, a comprehensive new chapter relating to mental health, mental illness, drug addiction, and alcoholism that radically changed the procedures for involuntarily committing for care and treatment persons who were mentally ill to an extent requiring hospitalization. 1967 Haw. Sess. L. Act 259, at 385. Under Act 259, which was codified as HRS chapter 334 (1968), initial admission of a mentally ill individual to a licensed psychiatric facility was effectuated solely by the administrator of the psychiatric facility or the administrator's deputy, upon the certificates of two licensed physicians, or in the case of an emergency admission, on the certificate of one physician. HRS §§ 334–51 to 334–55 (1968). This "medical model" for commitment was hailed as "progressive and liberal," *Suzuki v. Quisenberry*, 411 F.Supp. 1113, 1117 (D.Haw. 1976) (*Suzuki I* ), less "barbaric," and a more rational solution to dealing with the mentally ill, since it was "based primarily upon the safety, treatment, and rehabilitation of the individuals involved and secondarily upon the public safety and convenience." Samuel P. King, *Thou Shalt Not Commit*, 5 Hawai'i B.J. 46 (1968).

In *Suzuki I*, the United States District Court, Chief Judge Samuel P. King (Judge King) presiding, relied on *O'Connor* and its progeny to strike down as violative of the due process clause of the Fourteenth Amendment certain nonconsensual civil commitment statutory provisions [13] enacted by Act 259. Judge King also set forth the minimum due process requirements [14] that must be met in

---

**13.** Specifically, United States District Court Chief Judge Samuel P. King (Judge King) held:

> Since [HRS] § 334–53 purports to authorize nonconsensual hospitalization of any person solely because that person may be 'mentally ill ... to an extent requiring hospitalization,' that provision of law is unconstitutional on its face. This conclusion necessarily applies also to the conversion of an emergency commitment to a long-term commitment pursuant to [HRS] § 334–54, to the transfer of patients between hospitals pursuant to [HRS] § 334–71 or from out-of-state pursuant to [HRS] § 334–73(b), and to the authorization set out in [HRS] § 334–51(a)(2) and (5).

*Suzuki v. Quisenberry*, 411 F.Supp. 1113, 1124–25 (D.Haw.1976) (*Suzuki I* ).

**14.** Judge King held that at a minimum, the following procedural safeguards were required in connection with the nonemergency, nonconsensual commitment of persons pursuant to mental health laws:

(A) Adequate prior notice.
(B) Prior hearing before a neutral judicial officer.
(C) The right to effective assistance of counsel.
(D) The right to be present at the hearing.
(E) The right to cross-examine witnesses and to offer evidence.
(F) Adherence to the rules of evidence applicable in criminal cases.
(G) The right to assert the privilege against self-incrimination.
(H) Proof beyond a reasonable doubt.

connection with the nonemergency, nonconsensual commitment of a mentally ill person. Judge King retained jurisdiction of the case to rule on the constitutionality of any curative legislation that might be enacted.

In 1976, the legislature responded to *Suzuki I* by enacting Act 130, 1976 Haw. Sess. L. Act 130, at 229, which made numerous revisions to HRS chapter 334 to provide additional procedural safeguards and establish more restrictive substantive criteria for civil commitment. As codified, the criteria for involuntary hospitalization enacted by Act 130 were as follows:

    (1) Criteria. A person may be committed to a psychiatric facility for involuntary hospitalization if the court finds:

    (A) That the person is mentally ill or suffering from substance abuse, and

    (B) That he [or she] is dangerous to himself [or herself] or others or to property, and

    (C) That he [or she] is in need of care and/or treatment, and there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization.

HRS § 334–60(b) (1976). In a sequel lawsuit to *Suzuki I*, Judge King struck down as unconstitutional four provisions enacted by Act 130. *Suzuki v. Yuen*, 438 F.Supp. 1106 (D.Haw.1977) (*Suzuki II*). More precisely, Judge King held that: (1) dangerousness to property, a criterion for commitment under HRS § 334–60(b)(1)(B), was not a constitutional basis for commitment of an individual to a psychiatric facility in either an emergency or nonemergency situation, *id.* at 1110;

(2) HRS § 334–60(b)(1)(B) was unconstitutionally "ambiguous as to the degree of dangerousness to self or others required" because it "fail[ed] to require the finding of a recent overt act, attempt or threat of imminent and substantial danger before commitment may occur[,]" *id.;* (3) HRS § 334–60(b)(4)(G) [15] violated due process because it permitted temporary commitment of an individual based on *sufficient* evidence rather than *proof beyond a reasonable doubt, id.* at 1111; and (4) HRS § 334–60(b)(4)(G), which provided that an individual could be temporarily hospitalized for refusing to participate in a psychiatric evaluation to determine whether he or she should be committed, unconstitutionally deprived the individual of his or her privilege against self-incrimination. *Id.* at 1112.

On appeal from *Suzuki II*, the Ninth Circuit Court of Appeals affirmed Judge King's first and second rulings but concluded that HRS § 334–60(b)(4)(G), as amended by Act 130, did not unconstitutionally deprive persons of their privilege against self-incrimination; additionally, it was not necessary for the State of Hawai'i to establish the elements of commitment by proof beyond a reasonable doubt. *Suzuki v. Yuen*, 617 F.2d 173 (9th Cir.1980) (*Suzuki III*) (affirming in part, reversing in part, and dismissing in part *Suzuki II*).

In 1984, the legislature repealed HRS § 334–60 and enacted a new statutory provision, codified in 1985 as HRS § 334–60.2 and entitled "Involuntary hospitalization criteria." 1984 Haw. Sess. L. Act 188, § 3 at 371–72. The involuntary hospitalization criteria set forth in HRS § 334–60.2 were identical to

---

    (I) A consideration of less restrictive alternatives.
    (J) A record of the proceedings and written findings of fact.
    (K) Appellate review.
    (L) Periodic redeterminations of the basis for confinement.
*Suzuki I*, 411 F.Supp. at 1127 (1976).

**15.** At the time, HRS § 334–60(b)(4)(G) provided:
    (G) No individual may be found to require medical treatment unless at least one physician who has personally examined him testifies in person at the hearing. This testimony may be waived by the subject of the petition. If the subject of the petition has refused to be exam-

ined by a licensed physician, he may be examined by a court-appointed licensed physician. If he refuses and there is *sufficient evidence* to believe that the allegations of the petition are true, the court may make a temporary order committing him to a psychiatric facility for a period not more than five days for the purpose of a diagnostic examination and evaluation. The subject's refusal shall be treated as a denial that he is mentally ill or suffering from substance abuse. Nothing herein, however, shall limit the individual's privilege against self-incrimination.
HRS § 334–60(b)(4)(G) (1976) (emphasis added).

the criteria listed in the repealed HRS § 334–60, except that with respect to the second criterion, the word "imminently" was added prior to the word "dangerous," presumably to bring the statute in line with Judge King's ruling in *Suzuki II*.

In 1985, the legislature added a new category of individuals who could be involuntarily hospitalized at a psychiatric facility, namely those who are "gravely disabled." 1985 Haw. Sess. L. Act 75, at 123. According to the legislative history of Senate Bill No. 73, which was ultimately enacted as Act 75:

> The purpose of this bill is to enable the Family Court to order involuntary hospitalization for gravely disabled individuals.
>
> Gravely disabled persons are those who, as a result of a mental disorder, are unable to care for themselves, are unable to communicate rational or responsible decisions regarding their personal welfare, and fail to recognize this inability. The bill would enable the [c]ourt to order these people to be hospitalized so they can receive the appropriate care and treatment. Under the current law, only persons who are a danger to themselves or others can be hospitalized involuntarily. Preventive care and treatment is not available to gravely disabled persons to keep them from reaching the critical stage of dangerousness.

Sen. Stand. Comm. Rep. No. 485, in 1985 Senate Journal, at 1089. *See also* Hse. Stand. Comm. Rep. No. 977, in 1985 House Journal, at 1473; Sen. Stand. Comm. Rep. No. 53, in 1985 Senate Journal, at 927.

In 1986, the legislature added the "obviously ill" as a further category of individuals who could be involuntarily hospitalized. 1986 Haw. Sess. L. Act 335, at 715. The legislative history of Senate Bill No. 1831–86, which was signed into law as Act 335, stated:

> The purpose of this bill is to establish procedures for providing appropriate care and treatment to certain mentally ill individuals who cannot recognize their condition and appreciate the need for treatment. The bill applies only to individuals who suffer a disabling mental illnesses, [sic] and require medical treatment.
>
> The law does not currently respond to the needs of many mentally ill individuals, including schizophrenics, whose distinctive illness can be largely controlled with medication, but whose condition is susceptible to rather sudden deterioration that, without medical intervention, is virtually certain to produce a severe or extreme disability in a short time. Your [Conference] Committee realizes that it is essential to respect the personal freedom of such individuals, and to guard against measures that are shaped more by social convenience than by the needs of the mentally ill.
>
> Your Committee upon further consideration has amended S.B. No. 1831–86, S.D. 2, H.D. 1 by revising the definition of "obviously ill" to assure that it is legally sufficient to sustain involuntary hospitalization for treatment. The definition now focuses on individuals who cannot appreciate the serious and highly probable risks to their health and safety that will follow from refusing treatment, and also cannot comprehend the advantages of accepting medication.
>
> Too often, mentally ill individuals are ignored until their conduct can be described as criminal, and their condition requires lengthy hospitalization. The police, called upon to control the mentally ill individual, may easily recognize that the misconduct reflects illness rather than criminal intent. Under the Act proposed by the bill, mental health workers will be summoned and the degrading process of criminalization can be avoided. Other equally but not necessarily obviously ill individuals may have to undergo an unfortunate process of further deterioration before they can be hospitalized for treatment.
>
> Your Committee finds that the bill as amended meets an important need, and reflects the best current information about the mental conditions to which it could be applied.

Hse. Conf. Comm. Rep. No. 52–86, in 1986 House Journal, at 940. *See also*, Sen. Conf. Comm. Rep. No. 76–86, in 1986 Senate Journal, at 775.

Currently, the statutes governing involuntary civil commitment are codified in HRS chapter 334. The statutory criteria for com-

mitment are set forth in HRS § 334–60.2, which provides:

**Involuntary hospitalization criteria.** A person may be committed to a psychiatric facility for involuntary hospitalization, if the court finds:

(1) That the person is mentally ill or suffering from substance abuse;

(2) That the person is imminently dangerous to self or others, is gravely disabled or is obviously ill; and

(3) That the person is in need of care or treatment, or both, and there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization.

HRS § 334–60.2 (1993 & Supp.2002).

HRS § 334–1 defines various terms used in HRS chapter 334 and includes the following definitions that are relevant to these appeals:

"Dangerous to others" means likely to do substantial physical or emotional injury on another, as evidenced by a recent act, attempt or threat.

. . . .

"Dangerous to self" means the person recently has threatened or attempted suicide or serious bodily harm; or the person recently has behaved in such a manner as to indicate that the person is unable, without supervision and the assistance of others, to satisfy the need for nourishment, essential medical care, shelter or self-protection, so that it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded.

. . . .

"Gravely disabled" means a condition in which a person, as a result of a mental disorder, (1) is unable to provide for that individual's basic personal needs for food, clothing, or shelter; (2) is unable to make or communicate rational or responsible decisions concerning the individual's personal welfare; and (3) lacks the capacity to understand that this is so.

. . . .

"Mental health" means a state of social, psychological, and physical well-being, with capacity to function effectively in a variety of social roles.

"Mentally ill person" means a person having psychiatric disorder or other disease which substantially impairs the person's mental health and necessitates treatment or supervision.

"Obviously ill" means a condition in which a person's current behavior and previous history of mental illness, if known, indicate a disabling mental illness, and the person is incapable of understanding that there are serious and highly probable risks to health and safety involved in refusing treatment, the advantages of accepting treatment, or of understanding the advantages of accepting treatment and the alternatives to the particular treatment offered, after the advantages, risks, and alternatives have been explained to the person.

. . . .

"Treatment" means the broad range of emergency, out-patient, intermediate, domiciliary, and inpatient services and care, including diagnostic evaluation, medical, psychiatric, psychological, and social service care, vocational rehabilitation, career counseling, and other special services which may be extended to handicapped persons.

HRS § 334–1 (1993 and Supp.2002).

C. *Whether Doe Was Imminently Dangerous to Herself*

Although the United States Supreme Court has required that an individual be "dangerous," as well as mentally ill, in order to be involuntarily committed, the Court has never set forth any parameters for determining "dangerousness", an inherently difficult prediction to make. Kathleen Winchell, *The Need to Close Kentucky's Revolving Door: Proposal for a Movement Towards a Socially Responsible Approach to Treatment and Commitment of the Mentally Ill,* 20 N. Ky. L.Rev. 189, 201 (2002). *See also* Caroline M. Mee and Harold V. Hall, *Risky Business: Assessing Dangerousness in Hawai'i* 24 U. Haw. L.Rev. 63 (2001). In an attempt to provide more definite standards for deter-

mining dangerousness, the different states have legislated various criteria for making such an assessment. *See People v. Stevens*, 761 P.2d 768, 773 (Colo.1988) (discussing other states' statutory requirements).

In Hawai'i, the legislature has determined that in order to meet the "dangerousness" element for involuntary commitment, a person must be "imminently dangerous to self or others, ... gravely disabled or ... obviously ill." Since the State never alleged during proceedings below that Doe was "gravely disabled" or "obviously ill," [16] the sole issue presented on appeal is whether there is clear and convincing evidence in the record to support the family court's findings in Orders 1 and 2 that Doe was "imminently dangerous to self or others."

### 1.

■ Turning first to Order 2, the family court specifically found that Doe was

imminently and substantially dangerous *to others*, by clear and convincing evidence, in that at the hearing [Doe] stated to her brother her belief that his Filipino girl friend and he are the reason for her being in the hospital. *This confirms the diagnosis of mental illness* (Delusions of Persecution) *and inappropriate and hostile actions towards Filipinos, again which is needed to diagnose mental illness.*

(Emphases added.) The foregoing language is confusing. A confirmation that Doe is mentally ill is not a finding that Doe is imminently and substantially dangerous to others.

Additionally, our review of the record indicates that although there was expert opinion testimony adduced that Doe was imminently dangerous to herself because her aggressive racist remarks might provoke an assault against her, no evidence was offered that Doe was imminently dangerous to others, including the racial groups that she made remarks about.

We therefore reverse Order 2.

16. See footnote 4.

### 2.

■ In Order 1, the family court found that

[Doe] is imminently and substantially dangerous to self, by clear and convincing evidence, in that [Doe] recently has behaved in such a manner as to indicate that the person is unable, without supervision and the assistance of others, to satisfy the need for nourishment, essential medical care, shelter or self-protection, so that it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded, i.e. by refusing to take medications and chronically making racist, loud, inflammatory remarks to strangers which are very provoking and which are likely/probable to cause dangerous retaliation.

Doe contends that her refusal to take medications and her racist remarks to strangers constituted insufficient evidence to support the family court's finding that she was imminently and substantially dangerous to herself. In light of the statutory definition of the term "dangerous to self," we agree.

Pursuant to HRS § 334–1,

"[d]angerous to self" means the person recently has threatened or attempted suicide or serious bodily harm; or the person recently has behaved in such a manner as to indicate that the person is unable, without supervision and the assistance of others, to satisfy the need for nourishment, essential medical care, shelter or self-protection, *so that it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is accorded.*

HRS § 334–1 (1993 and Supp.2002) (emphasis added). The foregoing definition sets forth a much stricter standard for determining dangerousness than appears to be required by the United States Supreme Court. Under the Hawai'i statutory scheme, in order to establish that an individual is dangerous to self, there must be clear and convincing evidence that the individual either:

(a) Recently threatened or attempted suicide or serious bodily harm; or

**554**

(b) Recently behaved in such a manner as to indicate that the individual is unable, without supervision and assistance, to satisfy his or her need for nourishment, essential medical care, shelter or self-protection, so that *it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded.*

At the hearing on Petition 5, no evidence was presented that Doe had recently threatened or attempted suicide or serious bodily harm. The crucial issue, therefore, is whether there is clear and convincing evidence that Doe had recently behaved in such a manner as to indicate that she was unable, without supervision and assistance, to satisfy her need for nourishment, essential medical care, shelter or self-protection, so that she would probably die or suffer substantial bodily injury or serious physical debilitation or disease unless she were provided adequate treatment.

In determining that Doe was imminently and substantially dangerous to herself, the family court focused on Doe's refusal to take her medications and Doe's racist comments to strangers that the family court found would likely or probably provoke an assault on Doe. Under similar factual circumstances, other courts have concluded that involuntary hospitalization was permissible under their state statutes or case law. *See, e.g., In re Emmett J.,* 333 Ill.App.3d 69, 266 Ill.Dec. 631, 775 N.E.2d 193 (2002) (upholding involuntary hospitalization where evidence revealed that the respondent was schizophrenic, refused to voluntarily take his medications, had no one willing to assist him in his care, and physician testified that the only way to treat respondent was to administer psychotropic medication); *Boggs v. New York City Health & Hosps. Corp.,* 132 A.D.2d 340, 523 N.Y.S.2d 71 (1987) (Milonas, J. and Rosenberger, J. dissenting) (upholding involuntary commitment of petitioner where evidence demonstrated that petitioner: was mentally ill, having been diagnosed with chronic schizophrenia, paranoid type; was unable to comprehend her need for food, clothing, or shelter so that a threat of serious harm to her well-being was present; was in danger of assault because she screamed racial epithets at people; and engaged in self-destructive behavior, such as walking in front of moving cars).

To be considered "dangerous to self" under the Hawai'i statutory scheme, however, it is not enough that an individual is unable to satisfy the need for nourishment, essential medical care, shelter or self-protection without supervision and assistance of others. There must also be clear and convincing evidence that the individual's inability to satisfy his or her need for nourishment, essential medical care, shelter or self-protection without supervision and assistance of others *will probably* result in death, substantial bodily injury, or serious physical debilitation or disease unless adequate treatment is afforded to the individual. While there was clearly evidence adduced below that Doe's refusal to take her medications would result in her failure to get better, there was no clear and convincing evidence presented that Doe would probably die, or suffer substantial bodily injury, serious physical debilitation, or serious disease if she were not involuntarily hospitalized.

The basis of the family court's finding that Doe was imminently dangerous to herself, that Doe's racist remarks might provoke an assault against her, is also not supported by the record. While the evidence indicated that Doe's inappropriate remarks had upset other HSH patients and embarrassed her family in public, there was no evidence that any member of the public had ever retaliated or threatened to retaliate against Doe for her racist remarks in public. Regrettably, the type of behavior exhibited by Doe is not uncommon on the streets of many of America's larger cities, including Honolulu. We would like to think that most urban residents would realize that individuals such as Doe are mentally ill and respond with compassion, rather than anger and violence, when confronted by such individuals.

In light of our conclusion that Doe was not "dangerous to self," as that term is defined in HRS § 334–1, we need not address Doe's contention that her racist remarks constitut-

ed free speech protected by the First Amendment.[17]

### 3.

At oral argument, the State's counsel informed this court that due to constitutional concerns, the decision was made not to seek Doe's involuntary hospitalization on grounds that Doe was dangerous to herself because she was "gravely disabled" or "obviously ill." In light of our discussion on the relevant Supreme Court case law, we believe that the State's concerns may be misplaced. The Supreme Court has left to state legislatures the task of defining terms of a medical nature that have legal significance, and Hawai'i's legislature has decided that mentally ill individuals who are rendered dangerous to themselves because they are "gravely disabled" or "obviously ill" may be involuntarily hospitalized. Moreover, other state courts have upheld the involuntary hospitalizations of individuals like Doe. *See, e.g., Walker v. Dancer,* 386 So.2d 475 (Ala.Civ.App.1980); *People v. Stevens, supra; In re Emmett, supra; In re Mohr,* 383 N.W.2d 539 (Iowa 1986); *Consilvio v. Diana,* 269 A.D.2d 310, 703 N.Y.S.2d 144 (2000); *Boggs v. New York City Health & Hosps. Corp., supra; Brown v. Carolina Emergency Physicians, P.A.,* 348 S.C. 569, 560 S.E.2d 624 (2001).

Since the issue of whether Doe was dangerous to herself because she was "gravely disabled" or "obviously ill" was never presented on appeal, however, we decline to address the issue.

### CONCLUSION

Based on the discussion above, we conclude, in light of the procedural posture of the cases underlying these appeals, that the record lacks clear and convincing evidence to support the involuntary hospitalization of Doe pursuant to Petitions 5 and 6. Accordingly, we reverse the Findings and Order of Involuntary Hospitalization entered on June 19, 2000 and the Findings and Order of Involuntary Hospitalization entered on October 3, 2000.

Concurring Opinion by FOLEY, J.

I concur because the record in this case lacks clear and convincing evidence that Doe was "imminently and substantially dangerous to self or others," as these terms are defined in HRS § 334–1. I find it unnecessary to engage in a discussion on the constitutionality of Hawai'i's statutes governing involuntary civil commitment as set forth in HRS Chapter 334. The constitutionality of these involuntary civil commitment proceedings are not called into question in this case. Because the State failed to meet the statutory standard for the involuntary civil commitment of Doe, it is also unnecessary to address Doe's constitutional argument that her racial slurs were protected speech.

---

**17.** Although the Hawai'i Supreme Court recently held that racial slurs constitute fighting words that are not protected by the First Amendment, *State v. Hoshijo,* 102 Hawai'i 307, 321, 76 P.3d 550, 564 (2003) at 33–34 (Nakayama, J. dissenting, joined by Moon, C.J.), it is unclear whether the holding would apply to the factual circumstances of this case.